UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA


     -against-

                                Case No.:  24 CR 577-01(ER)


JOHANNA DE JESUS,

             Defendant.

-----------------------------------------------------------------X




<u>DEFENDANT'S SENTENCING MEMORANDUM</u>




                                   Luis O. Diaz, Esq.
                                   Attorney for Defendant
                                   32 Marble Hill Avenue
                                   New York, NY 10463
                                   Tel.: (212) 942-6400


TO:   JAY CLAYTON
       United States Attorney
       One St. Andrews Plaza
       New York, New York 10007
       Attn: Benjamin A. Gianforti
       Assistant United States Attorney

MEMBER NY, NJ & D.C. BAR

# LUIS O. DIAZ, ESQ. PLLC

### ATTORNEY AND COUNSELOR AT LAW

32 MARBLE HILL AVENUE
NEW YORK, NY 10463

TEL: (212) 942-6400 • FAX: (212) 942-3900
LODIAZLAW@GMAIL.COM

May 1, 2025

**Via ECF**
Honorable Edgardo Ramos
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re:    **U.S.A. v. Johanna De Jesus**
           Criminal Docket No.:  24 CR 00577-01 (ER)

Dear Judge Ramos:

My office has received the Pre-sentence Report ("PSR") prepared by the U.S. Department of Probation in connection with the above captioned matter, which is scheduled for Sentencing before Your Honor on May 15, 2025 at 11:30am.

Ms. De Jesus submits this letter/memorandum addressing objections to the Pre-Sentence Report and issues related to her sentence and to ask the Court for its consideration at sentencing based on the defendant's personal history and characteristics and other sentencing factors under 18 U.S.C. 3553(a), as well as the U.S. Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), Kimbrough v. United States, 128 S. Ct. 558 (2007), Gall v. United States, 128 S. Ct. 586 (2007).

2

1. <u>**PROCEDURAL HISTORY**</u>

Ms. De Jesus was arrested on May 7, 2024 and released on bond. Her codefendants Sarah Valerio Pujols, Charlie Hernandez, Emmanuel Torres, and Jarol Fabio were also arrested on May 7, 2024, pursuant to a warrant issued by the Southern District of New York. Ms. De Jesus pled guilty to a Superseding Information charging her with Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. §1960. On July 23, 2024, Sarah Valerio Pujols pled guilty to one count of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. §1960. On January 30, 3035, Ms. Valerio Pujols was sentenced to time served followed by one year of supervised release. On July 25, 2024, Charlie Hernandez pled guilty to one count of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. §1960. On December 20, 2024, Mr. Hernandez was sentenced to 3 months imprisonment followed by three years supervised release, 9 months served on home detention .  On August 12, 2024, Emmanuel Torres pled guilty to one count of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. §1960. On March 5, 2025, Mr. Torres was sentenced to 3 months imprisonment followed by one year supervised release. On August 13, 2024, Jarol Fabio pled guilty to one count of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. §1960. On February 21, 2025, Mr. Fabio was sentenced to 3 months imprisonment followed by one year supervised release.

2. <u>**THE PROBATION DEPARTMENT'S GUIDELINES CALCULATIONS**</u>

The Pre-sentence Report contains the following calculations for Ms. De Jesus :

**Base Offense Level**: The guideline for a violation of 18 U.S.C. § 1960 is USSG §2S1.1. Because the defendant did not commit the underlying offense from which the funds were laundered, the

base offense level is determined under USSG §2S1.1(a)(2). Pursuant to § 2S1.1(a)(2), the base offense level is 8, plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds. As the value of the laundered funds was $220,000, a 10-level increase is warranted, pursuant to § 2B1.1(b)(1)(F). Accordingly, the base offense level is 18, pursuant to USSG §§2B1.1(b)(1)(D) and 2S1.1(a)(2). The base offense level is 18. USSG §2S1.1(a)(2).

**18**

**Specific Offense Characteristic**: The offense level is increased six levels because subsection (a)(2) applies, and the defendant knew or believed that the laundered funds were the proceeds of an offense involving the manufacture, importation, or distribution of a controlled substance. USSG §2S1.1(b)(1).

**+6**

**Victim Related Adjustments**:  None.

**0**

**Adjustment for Role in the Offense**:  None.

**0**

**Adjustment for Obstruction of Justice**:    None

**0**

**Adjusted Offense Level - (Subtotal)**:

**24**

**Chapter Four Enhancements**: None.

**0**

**Acceptance of Responsibility**: The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).

-2

**Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).

-1

**Chapter Four Adjustment:** The defendant meets the criteria at USSG 4C1.1(a)(1)-(10). Therefore, the defendant is a Zero-Point offender, and the offense level is reduced by two levels. USSG §§4C1.1(a) and (b).

-2

**Total Offense Level**:                                                          **19**

The Defendant has no objections to a Criminal History Category of one. The Defendant's guidelines range at level 19 and Criminal History Category I is 30 to 37 months in custody. The Defendant submits a sentence of time served and one year supervised release is warranted in this matter.

## 3.    SENTENCING MANDATE AND FACTORS UNDER 18 U.S.C. § 3553(a)

Ms. De Jesus asks Your Honor to consider her personal history and characteristics, including single parent to three children; low risk of reoffending; loss amount overstating the seriousness of the offense under the guidelines, and her sincere dedication to her family and

friends, in light of *Booker* and section 3553(a) in fashioning an appropriate sentence.

In United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory guideline system created by the Sentencing Reform Act of 1984 (SRA) was unconstitutional.  The Booker decision "modified, the Federal Sentencing Act, as amended, 18 U.S.C. section 3551 et seq., 28 U.S.C.  section 991 et seq., to make the Guidelines effectively advisory."   After Booker, courts must treat the Guidelines as just one of a number of sentencing factors and must consider all of the factors enumerated in 18 U.S.C. section 3553 (a).

Section 3553(a) comprised of two distinct parts: the so called "sentencing mandate" contained in the prefatory clause of Section 3553 (a) and the "factors" to be considered in fulfilling that mandate.  The overriding principle and basic mandate of Section 3553 (a) requires district courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553 (a) (2): (a) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide just punishment); (b) deterrence; (c) incapacitation (to protect the public from further crimes); and (d) rehabilitation (to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner).

In determining the sentence minimally sufficient to comply with the section 3553 (a) (2) purposes of sentencing, the court must consider several factors listed in Section 3553 (a).  These factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentence available; (3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution where applicable.  18 U.S.C.  3553 (a) (1), (a)(5)-(7).  Neither the statute itself nor Booker suggests that

any one of these factors is to be given greater weight than any other factor. However, it is important to remember that all factors are subservient to Section 3553 (a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

Lastly, the Court is to consider the kinds of sentences available, pertinent policy statements issued by the Sentencing Commission, the need to avoid unwarranted disparities among similarly-situated defendants, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(3)-(7).

Section 3553(a) provides the Court with "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Genao, 869 F.3d 136, 146 (2d Cir. 2017). "The Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008). After considering all of the §3553(a) factors, the Court should decide whether to "impose…a sentence within the applicable Guidelines range or within permissible departure authority," or "to impose a non-Guidelines sentence." United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005), *abrogated on other grounds by* United States v. Fagans, 406 F.3d 138 (2d Cir. 2005). It is thus appropriate for courts to sentence defendants below the Guidelines range when such a sentence satisfies the purposes of 18 U.S.C. §3553(a).

It should be noted that the Guidelines are flawed in their construction by the fact that the Guideline range is constructed almost solely of aggravating factors. The only mitigating factors are acceptance of responsibility points and role in the offense. Mitigating factors are not part of the Guideline range and the policy statements attached to the Guidelines highly discourage the use of mitigating factors as a basis for departure. Thus, since the Supreme Court's decision in *Booker*, the case law is clear that although a Guideline calculation is a necessary beginning point of any sentence consideration, it should not be the final arbiter of what a reasonable and just sentence

should be.

Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. U.S. v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

In addition, consideration of the guidelines does not mean mandatory adherence, as they are advisory post Booker. See id; See also United States v. Booker, 543 U.S. at 220. In Jones, a case where the defendant was convicted of felony possession of firearms and a detectable amount of marijuana, the Court used its discretion and considered all of the circumstances surrounding the sentence and imposed a lower, non-guidelines sentence, which was held to be neither too high nor too low in light of the circumstances.  460 F.3d at 191. In the instant case, this Court should use its discretion and consider all of the circumstances to impose a sentence that is sufficient and not greater than necessary to comply with Section 3553 (a) (2).

Indeed, the Supreme Court has emphasized that "[a]lthough the Guidelines remain 'the starting point and the initial benchmark' for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court 'must make an individualized assessment based on the facts presented' and the other statutory factors."  *See* Beckles v. United States, 137 S. Ct. 886, 894 (2017) (citing *Gall*, 552 U.S. at 49, 50); *see also* Nelson v. United States, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." (emphasis in original)).

A Court can deviate from the Guidelines, including imposition of a non-custodial sentence, if it feels that the Guidelines require a sentence that is greater than necessary to satisfy the factors

of § 3553(a).  The Supreme Court has urged each sentencing court to consider all mitigating factors and not follow the policy statements of the Guidelines that are against the use of mitigating factors. *See Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 50 n.6.  *Gall* requires that a sentencing Court consider all "kinds of sentences available" by § 3553 even if the Guidelines only recommend a prison sentence.  *Id*. at 59 n.11.  In fact, courts are now invited to consider arguments that the applicable Guidelines fail properly to reflect § 3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless of the Guidelines.  *Rita*, 127 S. Ct. at 2465.  Courts "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," *Kimbrough*, 128 S. Ct. at 570 (internal quotation marks omitted), and when they do, the Courts of Appeals may not "grant greater fact-finding leeway to [the Commission] than to [the] district judge." *Rita*, 127 S. Ct. at 2463.

For example, in *Kimbrough*, the Supreme Court held that judges are free to impose a non-guidelines sentence on the basis of policy disagreements with the guidelines, such as the crack guidelines. While "[a] district judge must include the Guidelines range in the array of factors warranting consideration," the Court held, "[t]he judge may determine… that, in the particular case, a within-Guidelines sentence is greater than necessary to serve the objectives of sentencing." *Kimbrough*, 128 S. Ct. at 564.

 Furthermore, in *Gall* the Supreme Court held that "while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, Court of Appeals must review all sentences – whether inside, just outside, or significantly outside the Guidelines range – under a deferential abuse of discretion standard."  *Id*. at 591.  The Court specifically "reject[ed]… an appellate rule that requires 'extraordinary' circumstances to justify a

sentence outside the Guidelines range." *Id*. at 594-595. To hold otherwise would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id*. at 595. Indeed, the Court held that the sentencing judge "may not presume that the Guidelines range is reasonable." *Id*. at 590.

For the reasons discussed below, we ask that Your Honor impose a sentence of time served and one year supervised release is warranted in this matter, which will be appropriate and not greater than necessary to meet all purposes of sentencing.

## 4.    MS. DE JESUS' PERSONAL HISTORY AND CHARACTERISTICS

Ms. De Jesus sincerely regrets engaging in the unlawful conduct underlying this matter, rather than maintaining a law-abiding life. Her involvement in this offense surprised her family and friends, but they nonetheless continue to support her during this difficult time. Although Ms. De Jesus pled guilty to an offense involving laundered funds, her personal history and characteristics warrant a substantial downward variance.

Ms. De Jesus was born on March 21,1988 in Santo Domingo, Dominican Republic to Ramon Nunez Duran and Anna Hernandez. Ms. De Jesus' parents were never married and ended their relationship when De Jesus was approximately one year old because of her father's substance abuse. Unfortunately, Ms. De Jesus' father passed away after sustaining injuries in a car accident in 2019 at just 52 years old. Ms. Hernandez is a retired worker from retail jeweler, Tiffany & Co., and currently resides in Santo Domingo, Dominican Republic.

Ms. De Jesus grew up with two siblings from her parent's union, Estarlin Nunez, age 41, and Annie Carpio, age 39. Mr. Nunez currently resides in the Dominican Republic, while Ms. Carpio resides in Orlando, Florida. Ms. De Jesus also has two maternal half siblings, Nicholas

Hernandez, age 25, who is enlisted in the army, and Nyah Hernandez, age 23, who resides in Mount Vernon, New York. Ms. De Jesus also has one paternal half-brother, Manual Nunez, who resides in the Dominican Republic.

Ms. De Jesus grew up in the Dominican Republic from birth until the age of nine. In 1997, Ms. De Jesus and her siblings then reunited with her mother in 1997, where they lived at 142 North Terrace, Mt. Vernon, New York, for seven years. Ms. De Jesus attended public school in Mount Vernon until part of her senior year was over in 2005, in which she then lived in the Dominican Republic for the rest of her senior year of high school before returning to the United States. Ms. De Jesus then continued to reside in Mount Vernon, New York, until 2014, when she decided to move to Tampa, Florida, for employment. In 2015, Ms. De Jesus returned to New York until 2022, where she moved to Orlando, Florida with her then boyfriend. In 2023, she was then hired by Delta Airlines and moved to Atlanta, Georgia and subsequently Brooklyn, New York until 2024, where she returned to Orlando, Florida, with her three children.

Ms. De Jesus was raised in an urban setting in a working-class household in the Dominican Republic. At the age of five, Ms. De Jesus' mother immigrated to the United States, and she was left in the care of her maternal grandparents alongside her siblings. Ms. De Jesus was treated well by her grandparents, who were not wealthy, but consistently maintained shelter, food, and clothing. Unfortunately, because of poor infrastructure in the Dominican Republic, there were times she had no water. Nonetheless, she enjoyed the time she stayed with her parents from 1993 through 1997. She then resided with her mother, who worked hard maintaining two or three jobs at a time to support her family. Eventually, Ms. De Jesus' mother married Edgar Hernandez, who treated her fine, as well as her siblings.

Ms. De Jesus has three children from two prior relationships whom she takes care of. Ms.

11

De Jesus' daughter and son, Melanie and Johann Arevelo, are ages 13 and 12, and are enrolled in the seventh and eighth grade. Mr. Mevlin Arvelo, age 36, fathered Ms. De Jesus' oldest two children. Mr. Arvelo and Ms. De Jesus remained together from 2009 until 2014 and separated due to Mr. Arvelo's infidelity. They maintained a relationship until 2014, when their relationship ended because of infidelity by Mr. Arevelo. Mr. Arevelo is not providing financial support for their children on a consistent basis and only provides money twice a year and occasionally on their birthday. However, he does maintain telephone contact with the children. Nonetheless, Ms. De Jesus has an amicable relationship with her ex-boyfriend despite him not paying child support.

Ms. De Jesus' youngest child is Anais Israel, age two, whom she shares with Maxy Iverson Israel, age 41. Mr. Israel resides in lives Orlando, Florida, and is employed as an Uber driver. Initially, Ms. De Jesus met and dated Mr. Israel before she dated Mr. Arvelo After ending their initial relationship, Ms. De Jesus and Mr. Israel had not seen each other for several years. They resumed dating again in 2014, lived with each other on and off, in Mt. Vernon, and had their daughter, Anais in 2022. In August of 2022, they moved with their children to Florida. In February of 2023, Mr. Israel left their home that they shared together without notice and Ms. DeJesus did not know the reason. In December 2023, she learned Mr. Israel left because he was in a four-year relationship with her sister, Nyah Hernandez. According to the defendant, her relationship with her ex-boyfriend, Mr. Israel is now amicable. He resides in Florida and takes care of their daughter Monday through Wednesday; however, he does not provide any financial support for her.

Unfortunately, due to this incident, Ms. De Jesus has minimal contact with her sister, Ms. Nyah Hernandez. Prior to the cheating incident, the sisters were very close. Ms.  De Jesus and her sister, took trips together, celebrated birthdays together, and took care of each other's children. Ms. Herandez reportedly lived with her and the ex-boyfriend in New York. Ms. Hernandez and

Mr. Israel are no longer in a relationship. Despite the deteriorated relationship, at the time of her arrest in May 2024, Ms. Hernandez traveled to court with their stepfather to be of moral support.

In December of 2023, after finding out that her sister and boyfriend were cheating with each other, De Jesus started a romantic relationship with Carmelina Herrera, age 37, who lives at 125 Bloomfield Avenue, Woodbridge, New Jersey, and is employed as a substitute teacher. According to Ms. De Jesus, she had known Ms. Herrera for many years, and they were initially friends. Ms. De Jesus discussed the poor emotional state that she was in after finding out about her ex-boyfriend and sister's relationship. She described herself as being in a hole and reportedly Ms. Herrera took care of her during that situation. The defendant stated that she "just wanted to do something crazy" and described Ms. Herrera as figuratively "flying in and staying" with the defendant. The couple legally married in January 2024, after Ms. Herrera asked Ms. De Jesus to marry. According to Ms. De Jesus, she really cares a lot for Ms. Herrera. However, after attending church regularly she wants to be a "good Christian" and in April 2024, she decided to end her relationship with Ms. Herrera. Ms. De Jesus plans to divorce Ms. Herrera. They reportedly still remain friends.

We respectfully request that Your Honor take into account the foregoing information when fashioning a sentence that is both fair and not greater than necessary to meet all purposes of sentencing.

5.  **NEED FOR THE SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT**

A sentence of time served and one year supervised release is a "just" sentence that reflects

the seriousness of the offense and promotes respect for the law.

As mentioned earlier, this conviction will create a permanent stain in Ms. De Jesus' life. Ms. De Jesus has no prior criminal history. This case presents the first arrest with burdens and anguish of a substantial magnitude for Ms. De Jesus. Further, no one disputes the seriousness of this offense. However, a custodial sentence, much less a substantial one, is not required under the circumstances of this case to promote respect for the law and provide "just" punishment. Indeed, incarceration would serve no useful purpose. Its only purpose would be to incarcerate someone who is currently living a law-abiding life, supports a family, and poses no real risk of reoffending.

In addition, this Court should take into account the collateral consequences that will result from this conviction. In 2017, the U.S. Government Accountability Office found that there are roughly 641 collateral consequences of a nonviolent felony conviction, such as Ms. De Jesus' conviction. *See* GAO Report 17-691*, NONVIOLENT DRUG CONVICTIONS, Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), available at http://www.gao.gov/products/GAO-17-691.pdf. Indeed, Judge Frederick Block of the Eastern District of New York recognized that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant." United States v. Nesbeth, Case No. 15-CR-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (granting a downward variance where the guideline range was 33 to 44 months and issuing a sentence of one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences she faced as a convicted felon). Ms. De Jesus will face, *inter alia*, licensing restrictions and the inability to obtain employment.

Further, Ms. De Jesus has remained under pre-trial supervision and has abided by all set conditions. Indeed, upon her arrest, Ms. De Jesus quickly understood the seriousness of her

14

offense and was quick to understand the potential sentence she faced. The anguish she experienced as a result in and of itself, was sufficient to reflect the seriousness of the offense and promote respect for the law.

6.    **NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE**

General and specific deterrence are largely driven by the controversial and incorrect premise that longer sentences deter crime.

It is common to walk into a federal courtroom during a sentencing proceeding and listen to the judge tell the defendant that his custodial sentence will send a message to others.  However, "the value of this message is often insignificant."  Marc Mauer, *Long Term Sentences: Time to Reconsider the Scale of Punishment*, the Sentencing Project (Nov. 5, 2018), available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/.  Recent studies have emphasized the certainty of punishment rather than the length or severity of the punishment.  For example, Daniel Nagin, a leading deterrence scholar, concluded that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension."  *Id.* (quoting Nagin, D.S., (2013). *Deterrence in the Twenty-First Century: A Review of the Evidence. Crime & Justice)*; see also Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013) ("[T]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence

mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.").

Further, the problematic notion that longer sentences promote public safety has unfortunately led to mass incarceration. No one seriously disputes that the United States incarcerates individuals at an alarming rate. And that it is often low-income minority communities that are impacted the most by mass incarceration, particularly lengthy sentences. A report prepared by the Brennan Center for Justice, which reviews more than 40 years of data from all fifty states, finds that "increased incarceration were not the main drivers of the decline in crime and that increased incarceration has been declining in its effectiveness as a crime control tactic for more than 30 years." Dr. Oliver Roeder et al., *What Caused the Crime Decline?, Brennan Center for Just.*, 22-23 (Feb. 12, 2015), available at https://www. brennancenter. org/publication/whatcaused-crime-decline.

This Court should not rely on the now debunked notion that significant punishment reduces crime. *See Prosperi*, 686 F.3d at 41 (affirming the district court's downward variance and sentence of home confinement where the district court "rejected the view that the interest in general deterrence could only be served by incarceration"). As stated above, a prison sentence would seriously undermine Ms. De Jesus' efforts to maintain a law-abiding life and move on from the mistake she made.

## 7.    **NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT**

A sentence of time served and one year supervised release will not increase the likelihood of Ms. De Jesus re-offending.

It has been shown that longer sentences do not deter future criminal conduct or lower the chances of recidivism.  According to a report prepared by the Sentencing Commission, Ms. De Jesus has a low risk of reoffending. *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. Sentencing Commission (May 2004).  The first factor to consider in calculating the chances of recidivism is the number of previous convictions.  Studies have found that first offenders have a 3.5% chance of recidivism; those with one criminal history point have a 5.5% chance of recidivism; and those with two or more criminal history points have a 10.3% chance of recidivism.  Ms. De Jesus has no prior criminal convictions and therefore runs a very low risk of recidivating.

The second factor to consider is employment. Ms. De Jesus has maintained employment, working at Rio Maine Lobster in the areas of Orlando and Tampa, Florida. Previously, she also maintained employment through Delta Air from 2023-2024.  Third, education factors into the recidivism analysis.  Ms. De Jesus attended grades nine through eleven of high school at Mount Vernon High School and completed high school in the Dominican Republic.

A fourth factor to consider is family. The attached letters from family and friends shows just how much Ms. De Jesus values her family and how much they appreciate and love her.  Her family and friends have been very supportive of her during these tough times.  She is embarrassed and ashamed of her participation in this conspiracy. She has demonstrated an immense amount of regret and has acknowledged that what she did was wrong.  She wishes to put this behind her and live a law-abiding life.

Eleonora Perdomo Pichardo has considered Ms. De Jesus one of her best friends for many years. She expresses admiration for her and also adds that, "Johanna is the brightest soul I have ever known. Thanks to her, I have come face to face with kindness and nobility, love and

loyalty. She is a shelter in the truest sense—a source of warmth, a safe place for those she loves, and the sweetest presence for those of us who love her." (Exhibit A, Family Letters). Ms. De Jesus' close friend, Anny Carpio, writes, "I am truly grateful to have Johanna in my life. She embodies love, selflessness, and an unwavering commitment to her family and friends. I believe that her virtues deserve to be celebrated, and I feel fortunate to witness the profound impact she has on everyone she meets." (Exhibit A, Family Letters). Ms. De Jesus' best friend, Noelia Fernandez, considers Ms. De Jesus to be a sister to her. She writes, "She is the most selfless person I know, and I am so lucky to have her in my life…Johanna and I have worked since we were 15 years old, and she is the most hardworking woman working two jobs many times to be able to provide for family." (Exhibit A, Family Letters). Moises Quiros, another dear friend of Ms. De Jesus, writes, "Johanna De Jesus is an exceptional mother who always prioritizes her children's well-being. She is a responsible, caring and committed parent who ensures that her children grown up in a stable, safe, and loving environment." (Exhibit A, Family Letters). A dear friend for over seven years, Massiel Santana, has also stepped forward to write on behalf of Ms. De Jesus. She not only writes to share her respect and admiration for Ms. De Jesus' character, but also says, "I am extremely proud to call her my friend. I have always admired Johanna because everything she does, she does with genuine love and care. Her love extends not only to her children but also to all those around her." (Exhibit A, Family Letters).

Ms. De Jesus' brother, Juan Starlin Nunez, resides in the Dominican Republic. Nonetheless, he speaks highly of how much Ms. De Jesus has contributed to his life. Mr. Nunez states that, "I believe, understand, and agree that there are many good people in the world, but in my case, I must say that my sister is one of the kindest people in the world." (Exhibit A, Family Letters). Jaqueline Diaz Mendez writes, "As a mother, I know that Johanna is an exceptional

mother who is entirely dedicated to the well-being and happiness of her children. Her unconditional love, patience, and commitment are evident in every aspect of her parenting." (Exhibit A, Family Letters). Nigeria Bido, Ms. De Jesus' cousin, writes in support of Ms. De Jesus as she navigates this difficult time. Ms. Bido writes, "Johanna has always been a caring and dependable part of our family. She's the type of person who is there when you need her, whether it's for a celebration or a tough moment. Her actions show how much she values family and the people she loves… She is also incredibly hardworking, balancing responsibilities to provide them with a stable and loving home." (Exhibit A, Family Letters). Johanna's cousin, Liana Rodriguez, has been close with Ms. De Jesus her whole life. Ms. De Jesus helped raise Ms. Rodriguez, and she writes, "Johanna is an incredible mother because she showed me kindness, she nurtured me, she gave me love, and she gave me character. She plays a major role in who I am today. Great parents don't only nurture, bathe, and feed, but they teach support, and guide. I can tell you that if it were not for Johanna I would not be half the Woman I am today." (Exhibit A, Family Letters). Jasleen Nunez, Ms. De Jesus' eldest niece, writes, "Johanna is someone I have always seen give herself completely to her children. Her patience and dedication are admirable. She is always there to listen to their concerns, celebrate their achievements, and guide them every step of the way. Everyone knows this—it is a fact." (Exhibit A, Family Letters). The father of Ms. De Jesus' youngest child, Maxy Israel, has also written in support of Ms. De Jesus. Although no longer together, Mr. Israel and Ms. De Jesus remain friends. Mr. Israel writes, "Johanna de Jesús is an extraordinary woman, an exemplary mother who has always looked after the well-being of her children and her family. Her love and dedication toward them are evident in every decision she makes, always seeking what is best for her loved ones. In addition, she is an unconditional friend, someone who can be fully trusted, and who is always

willing to lend a helping hand to those in need. I would like to highlight that Johanna de Jesús

carries out admirable work in the Dominican Republic, where, together with her family, she

distributes toys to bring smiles to children who lack the resources to receive gifts. This act of

generosity and love has brightened the lives of many little ones and is just one example of her

great heart and commitment to others." (Exhibit A, Family Letters). Ms. De Jesus is clearly

loved by her family, friends, and community, and the generosity and kindness of her character

has clearly impacted many around her.

A final factor to consider is whether the offender committed a crime of violence. Ms. De

Jesus offense is a non-violent offense; thus, supporting a lower risk of recidivism.

The common misconception is that longer sentences are effective in deterring others from

engaging in criminal activity. However, scientific research has found that there is no connection

between the length of a sentence and deterrence. Of course, researchers have found that

"deterrence works;" however, only in the sense that our criminal justice system, in general, is

effective in deterring some criminal conduct. What this Court should consider is "marginal

deterrence," that is, whether any particular term of incarceration would be effective in deterring

criminal conduct. The scientific research available suggests that there is no significant relationship

between sentence-length and deterrence.    In fact, there is empirical research that suggests that

"increases in severity of punishments do not yield significant (if any) marginal deterrent effects."

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of

Research 28-29 (2006).   And longer sentences may actually increase rates of recidivism. Prison

disrupts education, employment, and family ties. It also exposes less serious offenders such as

Ms. De Jesus to serious offenders. This might actually increase the chance of reoffending. *See*

*The Criminogenic Effects of Imprisonment: Evidence from State Panel Data* 1974-2002, 6 Criminology & Public Policy 589 (2007).

Ms. De Jesus' understands the wrongfulness of her actions in the instant matter and has accepted responsibility for the unlawful conduct. The circumstances of this case, including Ms. De Jesus' lack of a criminal history, warrant a downward variance.  *See United States v. Clay*, 483 F.3d 739, 745-46 (11th Cir. 2007) (concluding that a downward variance was appropriate where the defendant, *inter alia*, posed a low risk of reoffending and a low safety risk to the community); *see also* United States v. Cherry, 487 F. 3d 366, 369-70 (6th Cir. 2007) (granting a significant downward variance where the defendant presented a low risk of reoffending); *Prosperi*, 686 F.3d at 48 (non-custodial sentence appropriate where there was little, if any, risk of reoffending); *See* United States v. Jackson, 537 F. Supp. 2d 990, 993 (E.D. Wisc. 2008) (granting a downward variance where there was "no need to protect the public for the period of time recommended by the guidelines").

## 8.    MS. DE JESUS DOES NOT POSE A DANGER TO THE PUBLIC

Ms. De Jesus' lack of criminal history and low risk of recidivism support a downward variance.

The Court is also required to consider the need for the sentence imposed to protect the public from Ms. De Jesus.  18 U.S.C. section 3553(a)(2)(C).  "Both the Guidelines calculations and the sentencing factors of section 3553(a) require a judge to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." United States v. Cherry, 483 F.3d 739, 745 (11th Cir. 2007).

As the PSR states, Ms. De Jesus does not have any prior criminal convictions. The Court can, and should, give significant weight to Ms. De Jesus' lack of a criminal history. *See* United States v. Williams, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming a below guidelines sentence and noting that "the district court emphasized that its decision to issue a below-Guidelines sentence—despite the severity of [the defendant's] offense—was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism."); United States v. Prosperi, 686 F.3d 32, 41 (1st Cir. 2012) (affirming the district court's downward variance and sentence of home confinement where the district court found that the defendant did not pose any risk of recidivism); United States v. Chase, 560 F.3d 828, 831 (8th Cir. 2009) (noting that the defendant's "lack of criminal history, even though already taken into account in calculating his advisory guideline range, could nevertheless have formed the basis for a variance"); *Cherry*, 687 F.3d at 370 (affirming a downward variance at least in part on the defendant's "low risk for reoffending").

Lastly, Ms. De Jesus pled to a non-violent offense. Arguably, Ms. De Jesus' financial hardships played a role in the commission of this offense. A single mother supporting her children and her family back in the Dominican Republic. But her financial hardship does not pose a danger to the public and it cannot justify a within Guidelines sentence. *See Jackson*, 537 F. Supp. 2d at 993 (considering that the defendant had a drug addiction but "was not violent and with treatment could succeed in the community" in imposing a below-guidelines sentence).

Accordingly, Ms. De Jesus' lack of a criminal history, her history of employment, and the strong familial support demonstrates that Ms. De Jesus is capable of living a law-abiding life and that she presents a substantially low risk of recidivism. Specific deterrence and incapacitation is sufficiently served through a sentence of time served and one year supervised release.

9.    **THE SENTENCING GUIDELINES OVERSTATE THE SERIOUSNESS OF THE DEFENDANT'S OFFENSE**

According to the PSR, the loss amount attributed to Ms. De Jesus' conduct ranges from $150,000 but less than $250,000. This added 10 offense levels to Ms. De Jesus' offense points and sets the guideline range for 30 to 37 months in custody.

Ms. De Jesus did in fact plead guilty and agree to the sentencing guidelines as part of her plea agreement. However, there are several factors to consider in calculating her contribution and culpability to the loss amount in question.

According to the Presentence Report, Ms. De Jesus is being held responsible for a total loss of $150,000, but less than $250,000. While she has agreed that this is the loss amount, the Guidelines only measure the money involved in the offense in question without separating individual culpability. The Guidelines place an emphasis on, "punitively measurable quantities, such as… the amount of financial loss in fraud cases, without however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp.2d 506,209 (S.D.N.Y. 2006). The Guidelines' standard is not considerate of a defendant's part in the offense in question and their actual conduct when calculating losses attributed to the offense. *Id*. at 512. Courts have found the loss calculations place.., "irrational emphasis on the monetary portion of the determination of a sentence." *See* United States v. Whitman, 904 F. Supp. 2d 363 (S.D.N.Y. 2012).

Relying on the standard for loss amount in the Guidelines calculation could lead to unfair culpability and equitability in a defendant's actual conduct. Loss amounts do not factor in personal profiteering amongst the group participating in the offense. By standardizing a defendant's

sentence to the size of the profits or scale of losses, this could lead to conduct being punished that does not necessarily apply to the defendant. Loss amounts are often, "a relatively weak indicator of the moral seriousness of the offense…" *See* <u>United States v. Emmenegger</u>, 329 F. Supp 2d 416, 4278 (S.D.N.Y. 2004). Some courts have also affirmed level downward departures attributed to offenses involving money schemes in part because the calculated losses were significantly overstated in comparison to the defendant's actual conduct. *See* <u>United States v. Broderson</u>, 67 F. 3d 452 (2d Cir. 1995).

Ms. De Jesus' sentencing exposure is greatly enhanced by the 10-level increase because of the loss amount. Notably, although Ms. De Jesus is may ultimately be responsible for this loss amount, she did not actually receive a substantial profit from her conduct in this case. Furthermore, there were several other codefendants involved that contributed to the loss amount. The sentence in this case should not, in essence, turn on the loss amount. The nature and circumstances of the offense and Ms. De Jesus' background do not warrant a sentence which would result in her deportation.

## 12.    <u>CO-DEFENDANTS AND RELATED CASES</u>

As Your Honor is aware, Ms. De Jesus is charged alongside co-defendants Sarah Valerio Pujols, Charlie Hernandez, Emmanuel Torres, and Jarol Fabio.   Mr. Hernandez was entered a guilty plea to pled guilty to one count of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. §1960. Mr. Hernandez was sentenced to 3 months imprisonment with 3 years supervised release, 9 months to be served on home detention. Mr. Fabio and Mr. Torres were sentenced to 3 months imprisonment and 1 year supervised release. However, Ms. Pujols was sentenced to time served and one year supervised release. In light of Ms. De Jesus' status as a single mother of three children and other factors discussed herein, we

24

ask for time served and one year supervised release.

13.    **FINE AND RESTITUTION**

Ms. De Jesus does not have the ability to pay a fine.

14.    **CONCLUSION**

We ask that Your Honor take into account Ms. De Jesus' personal history and characteristics; low risk of reoffending; loss amount overstating the seriousness of the offense under the guidelines, and her sincere dedication to her family and friends, in fashioning an appropriate sentence.

Ms. De Jesus' acceptance of responsibility demonstrates a sincere understanding of the wrongfulness of her actions and guards against reoffending.

We respectfully request that Your Honor impose a sentence of time served with and one-year supervised release. Such sentence is both appropriate and not greater than necessary to meet all purposes of Sentencing.

Respectfully submitted,

LUIS O. DIAZ, ESQ.

Enc.
Cc:    Benjamin A. Gianforti, Assistant U.S. Attorney (Via ECF w/ encl)