UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

JOHANNA DE JESUS,

        Defendant.

24 Cr. 577 (ER)

**GOVERNMENT'S SENTENCING MEMORANDUM**

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin A. Gianforti
Assistant United States Attorney
 -Of Counsel-

**Table of Contents**

I. Background .................................................................................................................. 2

    A. Offense Conduct ................................................................................................ 2

        1. KCM Status and Money Transmission Laws .............................. 2

        2. CW-1's MLO .................................................................................. 3

    B. Procedural History ............................................................................................ 6

    C. The Sentencing Guidelines ............................................................................... 6

    D. Prior Sentencings in this Matter ...................................................................... 7

II. Argument ..................................................................................................................... 9

    A. The Governing Legal Framework .................................................................... 9

    B. The Court Should Impose a Sentence of 3 Months' Imprisonment ...... 11

        1. The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment ......................................................... 12

        2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence ................................................................... 13

        3. The History and Characteristics of the Defendant .................... 15

III. Conclusion ................................................................................................................. 16

For a period of at least 6 years, former flight attendant Johanna De Jesus moonlighted as a money mule for an international money laundering operation ("MLO") that funneled drug money from New York City to the Dominican Republic. As a flight attendant for two different airlines, De Jesus was the perfect mule because she had "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allowed her to slip through airport security in the dedicated KCM lane at JFK International Airport ("JFK") and elsewhere with little to no scrutiny. In exchange for a few percentage points on each money run, De Jesus would smuggle bulk cash generated from local narcotics sales through airport security and then hand it off to another member of the MLO in the Dominican Republic. She did this repeatedly, apparently never stopping to consider that she was fueling the scourge that is the international drug trade.

The United States Probation Office ("Probation") calculates the sentencing Guidelines applicable to de Jesus as 30 to 37 months' imprisonment, and recommends a below-Guidelines sentence of 3 months' imprisonment, which is consistent with the sentences imposed in three out of the other four parallel cases involving flight attendants who moved drug money for the MLO. De Jesus asks for even greater leniency in seeking a sentence of time served, plus a year of supervised release. The Government joins Probation's recommendation of a short sentence of 3 months' imprisonment, to be followed by 3 years' supervised release. Such a sentence is well supported by the record and would be sufficient but not greater than necessary to serve the ends of Section 3553(a).

I.   **Background**

   A.   **Offense Conduct**

   1.   **KCM Status and Money Transmission Laws**

Large-scale narcotics suppliers who ply their wares in the United States often end up with the problem of having a significant amount of cash on hand in the United States that they would like to have access to and spend back home. (PSR ¶¶ 14-15). Unable to reliably use traditional banks to wire this cash out of the country, for fear of detection and interdiction, drug dealers often come up with more creative ways of getting their money into their pockets. (*Id.*) One common tactic favored by drug dealers based in the Dominican Republic is to enlist flight attendants who work routes between the United States and the Dominican Republic to smuggle large quantities of cash out of the country in exchange for a small percentage of the proceeds smuggled. (*Id.*). In one key respect, flight attendants make ideal money mules: they typically benefit from KCM status with the TSA, which in most cases allows them to breeze through airport security via a dedicated lane without being meaningfully searched. (PSR ¶¶ 15-19). The defendant had KCM status at all relevant times. (PSR ¶¶ 29, 33 and at 27).

Transmission of funds in this way, without a license to do so, is a criminal offense under federal law and the laws of the State of New York. *See* 18 U.S.C. § 1960; N.Y. Banking Law §§ 641, 650. The reason for this is simple: U.S. and New York State authorities seek to disrupt the flow of criminal proceeds just like those at issue here. Licensees are required to, among other things, report suspicious financial activity to

2

relevant authorities as a means of aiding the detection of the movement of funds derived from criminal activity. Under federal law, a money transmitter must obtain a license from the Financial Crimes Enforcement Network, a division of the U.S. Treasury. (*See* PSR ¶ 21). Under New York law, a money transmitter must obtain a license from the New York State Department of Financial Services. (*See* PSR ¶ 20). Torres has never held a federal or state license to operate a money transmission business. (PSR ¶ 23).

### 2. CW-1's MLO

In October 2021, the Government charged an individual ("CW-1") with money laundering and narcotics offenses in connection with CW-1's operation of the MLO into which CW-1 recruited De Jesus in or about 2017. (PSR ¶¶ 13, 24). CW-1 began cooperating with law enforcement soon after being charged and helped the Government build a case against De Jesus and other flight attendants that CW-1 used to move drug money from New York City to the Dominican Republic. CW-1 has moved millions of dollars for drug dealers in the Dominican Republic. These dealers are known to traffick in, among other things, fentanyl. (PSR ¶ 12). CW-1 personally sold significant quantities of oxycodone, some of which was laced with fentanyl, to undercover agents prior to being charged.

Over the course of the approximately 6 years that De Jesus moonlighted as a money mule for CW-1's MLO, CW-1 estimates that De Jesus smuggled at least $2 million in narcotics proceeds out of the United States at CW-1's direction. (PSR ¶ 24). The Government estimates that De Jesus earned tens of thousands of dollars from this side hustle, based on CW-1's estimates of the total amount of cash De Jesus

3

smuggled and the low percentage-point fee De Jesus charged for this service; indeed, De Jesus earned thousands just off the money runs that the Government orchestrated through CW-1. (*See* PSR ¶ 31). De Jesus knew she was moving drug money, or funds represented to be drug money. (PSR ¶¶ 24, 27-31, 33).

Having already moonlighted as a money mule for several years, De Jesus proactively reached out to CW-1 in or about April 2022, shortly after joining Republic Airways, sending CW-1 a text message asking CW-1 to put her on CW-1's "payroll," with an airplane emoji to make it crystal clear what payroll she meant: the MLO's payroll. (PSR ¶ 25). On or about May 9, 2022, CW-1 responded to De Jesus at the direction of law enforcement and asked if she was working any flights to the Dominican Republic in the next few months. (PSR ¶ 26). De Jesus indicated that she was not, but that she could easily get assigned to that route. (*Id.*).

Approximately a week later, De Jesus made good on this promise and sent a text message to CW-1 notifying CW-1 that she had been assigned to a flight to the Dominican Republic, but did not want to go down there "empty"—i.e., without drug money. (PSR ¶ 27). CW-1 responded the same day, telling De Jesus, in sum and substance, that CW-1's drug dealer clients were collecting cash that they needed moved down to the Dominican Republic in early June 2022. (*Id.*)

On or about May 28, 2022, CW-1 sent De Jesus a text message at the direction of law enforcement, stating that CW-1 had $60,000 in cash for De Jesus to bring to the Dominican Republic. (PSR ¶ 28). De Jesus readily agreed in exchange for a 3.5% fee and, on or about May 31, 2022, she and CW-1 met in Mount Vernon, New York

4

for the handoff of the cash, which CW-1 represented to be the proceeds of narcotics trafficking. (*Id.*). During the course of their conversation, De Jesus told CW-1 that she was moving drug money for someone else and also selling narcotics herself. (*Id.*).

On or about June 1, 2022, De Jesus flew the $60,000 to the Dominican Republic, having secreted it through airport security thanks to her KCM status. (PSR ¶ 29). De Jesus was joined by a co-conspirator ("CC-1"). (*Id.*) When De Jesus and CC-1 arrived in the Dominican Republic, CC-1 handed off $53,800 to CW-2, who subsequently returned the funds to law enforcement. (*Id.*). The PSR omits that, afterward, CW-1, at the direction of law enforcement, sent De Jesus a text message stating that the cash that CC-1 gave to CW-2 was short by approximately $4,100. The next day, CC-1 and CW-2 met up again and CC-1 handed over an additional $4,000 that CW-1 returned to law enforcement.

On or about August 15, 2022, at the direction of law enforcement, CW-1 contacted De Jesus again about another money run. (PSR ¶ 30). Having now done this for several years, De Jesus asked CW-1 if CW-1 could make sure that the money was "pretty" before giving it to her—i.e., in crisp, new, higher denomination bills rather than old, worn, lower denomination bills. (*Id.*).

On or about August 22, 2022, De Jesus met CW-1 in Brooklyn and took an additional $60,000 in funds that CW-1 represented to be drug money. (PSR ¶ 31).[1] The same day, De Jesus brought the cash down to the Dominican Republic and

---

[1] The PSR incorrectly states that this handoff occurred on August 22, 2023.

handed it off to CW-2, less her 3.5%/$2,100 fee. (*Id*.). CW-2 returned the remainder to law enforcement. (PSR ¶ 32).

De Jesus carried out similar money runs for an undercover law enforcement agent posing as a money launderer for drug dealers and CW-1 for a slightly higher fee of 4% on or about May 2, 2023 and June 2, 2023, respectively. (PSR ¶¶ 31-32).

### B. Procedural History

On April 30, 2024, United States Magistrate Judge Sarah L. Cave issued a criminal complaint charging De Jesus with operation of an unlicensed money transmission business, in violation of 18 U.S.C. §§ 1960 & 2, and entering an airport or aircraft area in violation of security requirements, in violation of 49 U.S.C. §§ 46314(a) and (b)(1). De Jesus was arrested on May 7, 2024, and presented the same day before United States Magistrate Judge Gary Stein. De Jesus was bailed and has been on pretrial supervision since her arrest, with no issues complying with the terms of her release.

On October 3, 2024, De Jesus pleaded guilty before this Court, pursuant to a plea agreement, to an information charging her with a single count of violating 18 U.S.C. §§ 1960 & 2, in connection with her involvement in CW-1's MLO.

### C. The Sentencing Guidelines

The Government and Probation arrived at the same Guidelines calculation in this matter: a base offense level of 18, pursuant to U.S.S.G. §§ 2S1.1(a)(2) & 2B1.1(b)(1)(F); a six-level enhancement because the defendant knew or believed that the laundered funds were the proceeds of narcotics activity, pursuant to U.S.S.G. § 2S1.1(b)(1); a three-level deduction for acceptance of responsibility, pursuant to

U.S.S.G. §§ 3E1.1(a)-(b); and a further two-level deduction under the Zero-Point Offender Guideline, pursuant to U.S.S.G. § 4C1.1(a), for a total offense level of 19. De Jesus has no criminal history and therefore is in Criminal History Category I. Her stipulated Guidelines Range under the plea agreement is 30 to 37 months' imprisonment. (*See* PSR ¶ 5).

### D. Prior Sentencings in this Matter

The Government is aware of and charged five flight attendants whom CW-1 used as money mules. Three of those five—Charlie Hernandez, Jarol Fabio, and Emmanuel Torres—were sentenced to 3 months' imprisonment.[2] The fourth, Sarah Valerio Pujols, was sentenced to time served and one year of supervised release.[3]

#### 1. Charlie Hernandez

In sentencing Hernandez, Judge Abrams noted that the 3553(a) factors that were most critical to her reasoning were "general deterrence and recognizing the seriousness of the crime." (Abrams Tr. 18).

With respect to the seriousness of the offense, Judge Abrams noted, among other things, that far from being an isolated "short lapse in judgment….this was five years, with the government estimating that [Hernandez] laundered approximately

---

[2] *See United States v. Hernandez,* 24 Cr. 447 (RA); *United States v. Fabio,* 24 Cr. 481 (AS); *United States v. Torres,* 24 Cr. 474 (CM). A copy of the *Hernandez* sentencing transcript is attached here as Exhibit 1. References thereto use the designation "Abrams Tr.__." A copy of the *Fabio* transcript is attached here as Exhibit 2. References thereto use the designation "Subramanian Tr.__." The Government does not have a copy of the *Torres* sentencing transcript.

[3] *See United States v. Valerio Pujols*, 24 Cr. 442 (NRB).

7

two and a half million dollars, even if he only received a small portion in return. And he only stopped because he saw someone else [the defendant] get arrested." (Abrams Tr. 21). Judge Abrams also focused on the fact that Hernandez had moved funds linked to the international fentanyl trade, which "cause[s] real harm to real people," noting that she had "had a number of cases since [becoming] a judge where people have died of fentanyl overdoses." (Abrams Tr. 21-22). "[T]hese organizations can't function without getting their proceeds…and you helped in that process. And, as I said, you didn't do it for a week or two weeks or even a year. You did it for five years." (Abrams Tr. 22).

With respect to the need for general deterrence, Judge Abrams noted that she thought a 3-month term of imprisonment would result in real "deterrence within this community of flight attendants and others who work in that industry." (Abrams Tr. 23; *see also* Abrams Tr. 16-17, 29).

### 2. Jarol Fabio

In sentencing Fabio, Judge Subramanian, like Judge Abrams, emphasized the seriousness of the offense given its connection to the international fentanyl trade, which "each year takes the lives of tens of thousands of people." (Subramanian Tr. 32). Judge Subramanian also agreed with Judge Abrams that, with respect to general deterrence, "we have a small community of people who are uniquely in a position to be influenced by what happens to their colleagues, and if there is a way of stopping some of this money from going through these channels, if there is a way to slow the drug trade, this trade that's killing tens of thousands of Americans each year, then

8

that's one of the purposes that Congress says I have to consider." (Subramanian Tr. 32-33).

## II. Argument

### A. The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 200, 204 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)); *see also*, *e.g.*, *United States v. Solis*, 18 F.4th 395, 405 (2d Cir. 2021) ("District courts are to use the Guidelines as a 'starting point' and then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant' and all other statutory factors.").

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legiti-

9

mate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6);[4] and "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

>   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B)   to afford adequate deterrence to criminal conduct;
>
>   (C)   to protect the public from further crimes of the defendant; and
>
>   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

---

[4] Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). Because Section 3553(a)(6) was intended to address national disparities, "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)." *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)). By this same logic, this Court may—but is not required to—consider sentencing disparities with other defendants in this District.

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B.     The Court Should Impose a Sentence of 3 Months' Imprisonment

A sentence of 3 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, the need to avoid unwarranted sentencing disparities among defendants, and the history and characteristics of the defendant. A balance of these factors weighs

11

in favor of the Government's recommended sentence, and against the undue leniency the defendant seeks through her request for a non-custodial sentence.

### 1. The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of the offense and the need for just punishment warrant a term of imprisonment. The international drug trade, and particularly the international trade in opioids like fentanyl and oxycodone, is a scourge in the United States. The opioid epidemic in this country has been well documented and has led to many, many destroyed lives, violence, and obscene wealth for large-scale traffickers like those that made up CW-1's client base. De Jesus was just a small part of this, but was nonetheless a vital pipeline for the money that keeps this drug trade running and profitable. She knew what this money was and she smuggled it out of the country again and again and again. Indeed, she claimed to CW-1 that she was running money for other drug dealers and was even dabbling in the drug trade herself. She could have found other ways to make a little extra money if she needed it, but, no, she decided to go into the money muling business. Thanks to her, some drug lords in the Dominican Republic are that much richer.

What makes matters worse is that De Jesus abused a position of trust bestowed upon her as a flight attendant with KCM status.[5] De Jesus knew that she

---

[5] In preparing the PSR for defendant Sarah Valerio Pujols, as well as the other flight attendants charged in connection with CW-1's MLO, Probation asked the Government whether it felt the abuse-of-trust enhancement was appropriate on the facts presented here. The Government initially agreed that the enhancement would be appropriate, but, upon further consideration, no longer does. Probation did not include the enhancement here.

could breeze through airport security at JFK with little to no scrutiny. After CW-1 approached her, she learned that this access could be monetized, which she did over and over again—indeed, even proactively reaching out to CW-1 in or about April 2022 to make sure she stayed on CW-1's "payroll."(PSR ¶ 25). Airports are in many ways the front lines of national security and law enforcement in this country. They have a unique role in helping to screen and disable potential threats and criminal activity. De Jesus thumbed her nose at all of that to make a few bucks.

All of these reasons support a sentence of 3 months' imprisonment.

### 2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a sentence that includes a meaningful term

---

U.S.S.G. § 3B1.3, Application Note 1, makes clear that the enhancement is principally intended for defendants who hold positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." The examples provided by the Guidelines Commission include those with certain duties of care, such as an attorney embezzling funds from a client for whom the attorney is acting as a legal guardian, "a bank executive's fraudulent loan scheme," or "the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." While the enhancement may appear applicable based on the defendant's violation of the position of trust she was conferred through her KCM status, the Government's position is that a flight attendant falls closer to the bank teller/hotel clerk-end of the spectrum than the attorney/bank executive/doctor-end of the spectrum, and therefore the enhancement does not apply. The Government discussed its position with Judge Abrams at Hernandez's sentencing and, although she agreed that there had been a clear abuse of the trust in a more general sense, she ultimately did not apply the enhancement. (*See* Abrams Tr. 4, 8-9). Neither Judge Subramanian nor Judge Buchwald applied the enhancement, either.

13

of imprisonment. Again, De Jesus was well aware of the special access to airports that she was granted by virtue of being a flight attendant with KCM status. But she treated that access like an ATM card, demonstrating a profound disrespect for the law.

While the Government agrees in large part with the defense that the defendant has likely been sufficiently specifically deterred from doing anything like this again, there is still a need for general deterrence here, particularly when viewed through the lens of the flight attendant industry. De Jesus's arrest and the arrests of the other flight attendants in CW-1's MLO were well-covered in the press and the Government hopes that U.S. airlines have started to make changes to address the risk of abuse that comes along with KCM status. But there is nonetheless a need to demonstrate that this kind of abuse comes with serious consequences, including jail time. The risk is that a slap on the wrist, like a period of supervised release, will not fundamentally change the calculus for others with KCM status: if people have been slipping through the net for so long, and can easily make extra money, those with KCM status may conclude that it is more than worth the risk of facing a short period of supervised release.[6] The calculus should be that rolling these dice could land you in jail, with no prospect of employment in the airline industry on the other side. Judge Abrams, Judge Subramanian, and Judge McMahon rightly acknowledged this; Judge Buchwald did not.

---

[6] The Government understands that the TSA is in the process of replacing the KCM program with a new program known as the Crewmember Access Point program.

### 3. The Need to Avoid Unwarranted Sentencing Disparities among Defendants and the History and Characteristics of the Defendant

As noted above, three of the four flight attendants who have been convicted and sentenced in connection with their participation in CW-1's MLO have received identical sentences of 3 months' imprisonment. One of the four was sentenced to time served with a year of supervised release. De Jesus, however, is the most culpable of all of the charged flight attendants. While the total amount of money that CW-1 estimates De Jesus moved is consistent with other defendants, her Guidelines range is the highest of the five flight attendants because she stayed in CW-1's rotation consistently, including across numerous sting operations where CW-1 was working at the direction of law enforcement. She also stands out from the crowd because she claimed to be engaging in other criminal conduct, including moving money for another money launderer and dealing drugs herself.

The only meaningful difference between De Jesus and the three flight attendants who got jail time is that she, like Sarah Valerio Pujols, is a mother. De Jesus is also apparently the sole caregiver for her children, with no obvious alternatives. To be sure, this is mitigating, but not so mitigating as to warrant a non-custodial sentence out of sync with Judge Abrams' 3-month sentence for Charlie Hernandez, Judge Subramanian's 3-month sentence for Jarol Fabio, and Judge McMahon's 3-month sentence for Emmanuel Torres. Indeed, in a certain sense, De Jesus's personal circumstances should be viewed as aggravating, rather than mitigating. By putting herself at risk, De Jesus put her children at risk. That was her choice. Rather than

providing for her children by making an honest living, she turned again and again to making a quick, easy buck by laundering drug money. The Government's substantially below-Guidelines recommendation of 3 months' imprisonment accounts for these mitigating facts and is an appropriate disposition in light of these personal characteristics and the other 3553(a) factors.

### III.   Conclusion

For the reasons set forth above, this Court should sentence De Jesus to 3 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Dated:   New York, New York
         May 8, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney

                              By:       _____
                                        Benjamin A. Gianforti
                                        Assistant United States Attorney
                                        (212) 637-2490